UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMANDA N. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02670-JMS-TAB |
| | ) | |
| SUSAN MOORE[1], | ) | |
| TRENAE LOWERY, | ) | |
| JULIE MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTIONS TO SUBSTITUTE PARTY,
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Amanda Dixon, an Indiana Department of Correction ("IDOC") inmate, filed this action pursuant to 42 U.S.C. § 1983. She alleges that she cut her right pinky finger when equipment she was using for a facility event malfunctioned. Dkt. 9. Ms. Dixon alleges that Dr. Moore and Registered Nurses Lowery and Murphy delayed treatment and pain medication for her medical condition in violation of her Eighth Amendment rights. *Id.*

The defendants seek resolution of the claims through summary judgment. For the reasons explained below, the defendants' motion for summary judgment, dkt. [57], is **GRANTED**. The plaintiff's motions to substitute a party, dkts. [77] and [80], are **DENIED**.

### I. Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

---

[1] On April 27, 2021, after the briefing on the defendants' motion for summary judgment was complete, the defendants provided notice to the Court that Dr. Susan Moore died in December 2020. Dkt. 72.

as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. Am. Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).  Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th

Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. Material Facts

### A. The Parties

Amanda Dixon, at all times relevant to her complaint, was incarcerated at the Indiana Women's Prison ("Women's Prison"). Dkt. 1. On Saturday, July 15, 2017, Ms. Dixon suffered a cut to her right pinky finger while operating a dunk tank at the facility. Dkt. 59-5 at 1 (Dixon medical records).

Dr. Susan Moore was a physician licensed to practice medicine in the State of Indiana and was employed by Wexford of Indiana, LLC ("Wexford"), as the Medical Director at the Women's Prison during the time of Ms. Dixon's allegations. Dkt. 59-1, ¶¶ 1-2 (Moore Affidavit). Dr. Moore was no longer employed at the Women's Prison at the time the defendants' filed their motion for summary judgment. *Id.*, ¶ 2. Dr. Moore died in December 2020. Dkt. 72 (Notice of Suggestion of Death).

Julie Murphy and Tre'Nae Lowery are registered nurses licensed in the State of Indiana. They were employed by Wexford at the Women's Prison during the time of Ms. Dixon's

allegations. Dkt. 59-2, ¶¶ 1-2 (Murphy Affidavit); Dkt. 59-3, ¶¶ 1-2 (Lowery Affidavit). Ms. Murphy served as the Health Services Administrator ("HSA"). Dkt. 59-2, ¶¶ 1-2

### B. Dr. Moore

Dr. Moore was not at the facility on July 15, 2017, when Ms. Dixon cut her finger. Dkt. 59-1, ¶ 5. Dr. Moore received a phone call from Nurse Lowery about Ms. Dixon's injury, and Nurse Lowery "initially thought that it appeared to need stitches." *Id.* at 2; dkt. 59-1, ¶ 5. The size of Ms. Dixon's wound was documented at a length of 5 cm, width of 3 cm, and depth of .50 cm, and upon initial examination in the infirmary, Nurse Lowery noted that it was actively bleeding. Dkt. 59-5 at 2.  At this time, Ms. Dixon's wound was examined and cleaned, she was given regular Tylenol and ice, and after her Tetanus status was reviewed, she received a Tetanus shot. Dkt. 59-1, ¶ 5; dkt. 59-5 at 3.

At first, Dr. Moore planned to come in to stitch the cut. Dkt. 59-5 at 2; dkt. 68-2 at 57 (report of offender injury). But she "wanted to observe the injury due to difficulty achieving hemostasis as nursing staff had first indicated that the pressure bandage did not control the bleeding." Dkt. 59-1, ¶ 5.

Dr. Moore received a second call later that day to inform her that "further attempts with a pressure bandage" controlled the bleeding. *Id.*, ¶ 6. "[B]ased on evidence-based medical research" and the description of Ms. Dixon's wound as "gapping with jagged edges," Dr. Moore determined that a delayed primary closure of the wound was a more appropriate course of treatment. *Id.*[2] Dr.

---

[2] Ms. Dixon argues that there are inconsistencies in interrogatory responses. First, that Dr. Moore's responses to interrogatories stated that Nurse Lowery did not describe the wound as ever needing stitches, and that Nurse Lowery's responses to interrogatories stated that she did advise Dr. Moore that stitches may be needed. Dkt. 67 at 4. Ms. Dixon further argues that Nurse Lowery's responses state that there was "no new information" relayed to Dr. Moore to change her mind about her initial approach to close the wound the same day of the injury. *Id.* However, this argument is inconsistent with the undisputed evidence that Nurse Lowery had a subsequent phone conversation with Dr.

Moore attested that when suturing a wound, "the goal is to approximate the edges of the laceration," but this could not be done in Ms. Dixon's case because the edges of her wound could not be re-approximated. *Id.* Ms. Dixon's wound "could not be closed using sutures at that time due to both swelling and the amount of skin tissue that was missing" from her finger. *Id.* Dr. Moore attested that to close the wound initially would cause excessive tension on the wound edges and could have caused further tissue damage that could lead to "tissue necrosis, gangrene, or possible loss of the finger." *Id.* Dr. Moore ordered that a pressure bandage be applied to the wound and Tylenol 3 be administrated to Ms. Dixon for pain, in lieu of immediate wound closure, as her goal was to control the bleeding and reduce swelling until she could examine the injury on Monday, July 17, 2017. *Id.*; dkt. 59-5 at 3.

The next day, Dr. Moore ordered that Ms. Dixon receive an x-ray of her hand to determine if the wound retained any debris from the metal dunk tank, and the x-ray revealed "no bony abnormality and no fracture." Dkt. 59-1, ¶ 7; dkt. 59-5 at 5-6; dkt. 68-2 at 84 (Meridian x-ray findings, "fail to demonstrate fracture or dislocation").

Dr. Moore first examined Ms. Dixon two days post-injury, on Monday, July 17, 2017. Dkt. 59-1, ¶ 8; dkt. 59-5 at 7-9. She attested that her decision to perform a delayed primary closure was supported because during this examination, steri-strips were placed to approximate the wound but due to missing tissue and swelling, this could not be completed. Dkt. 59-1, ¶ 8. Dr. Moore continued Ms. Dixon's prescription for Tylenol 3. Dkt. 59-1, ¶ 8; dkt. 59-5 at 7-9. The wound did

---

Moore and documented and described the wound as "gaping with jagged edges." Dkt. 59-1, ¶ 6; dkt. 59-6; dkt. 68-2. The Court does not find a material fact issue here, as the record reflects that Dr. Moore initially planned to close the wound with stitches, but that she opted to pursue a different course of treatment, a delayed primary closure, due to the status of the laceration being "gaping with jagged edges." Dr. Moore further articulated her rationale for changing the treatment plan in her affidavit, describing that the wound was swollen, and a large amount of skin was missing. Dkt. 59-1, ¶ 6.

not appear infected, it was cleaned and bandaged, Ms. Dixon's Tetanus shot was up to date, and Dr. Moore ordered that Ms. Dixon leave the dressing in place until a follow up appointment on Thursday, July 20, 2017. *Id.* Dr. Moore notified HSA Nurse Murphy to have Ms. Dixon moved to a low bunk. Dkt. 59-1, ¶ 9. Dr. Moore attested that a low bunk request requires the HSA to coordinate bed moves with the facility's custody staff, which can take time, but Dr. Moore "was not informed of any problems fulfilling the low bunk request for Ms. Dixon." *Id.* Ms. Dixon testified that while Dr. Moore said this was being taken care of, it took approximately 9 days and the intervention of her case worker, for her to successfully be moved. Dkt. 59-4 at 47-48.

On June 18, 2017, Ms. Dixon saw a nurse, a non-defendant in this case, and stated that she went 8 hours without pain medication or pain control, that her finger was still bleeding, that she needed to see a specialist, that she was becoming nauseous due to the pain, and that the nausea medicine was not effective. Dkt. 59-5 at 10-13. The treating nurse did not observe bleeding, provided a sling to Ms. Dixon to keep her hand elevated, advised her to continue ice compresses, and advised her to take her prescribed Tylenol 3, every "8 hours and to not delay or skip doses." *Id.*; dkt. 59-1, ¶ 10. Ms. Dixon testified that she was "pretty sure" all of her medication was prescribed "as needed" or "PRN." Dkt. 59-4 at 36-37. Ms. Dixon's Medical Administration Record ("MAR") indicated that she was taking the pain medication nearly every 12 hours. Dkt. 59-5 at 10-13, 27-31; dkt. 59-1, ¶ 10. Ms. Dixon was advised by nursing staff that she could also discuss pain management with Dr. Moore at her Thursday, July 20, 2017 follow up appointment. Dkt. 59-5 at 10-13; dkt. 59-1, ¶ 10.

Dr. Moore attested that she ordered that Ms. Dixon take 2 tablets of Tylenol 3 every 8 hours, totaling 9 doses from July 15, 2017 through July 19, 2017. Dkt. 59-1, ¶ 10. The medical records indicate Ms. Dixon was administered this medicine once on July 15 and 16, twice on July

6

17, twice on July 18, and once on July 19 and 20, or 8 doses. *Id.* dkt. 59-5 at 31. Dr. Moore continued to prescribe this pain medication after the follow up visit on July 20, 2017. Dkt. 59-1, ¶ 13. However, as a facility doctor, she is "not responsible for dispensing or administering medications to patients" and relies on the nursing staff to do this according to her orders. *Id.*, ¶ 12.

Dr. Moore saw Ms. Dixon for follow-up on July 20, 2017 and noted that Ms. Dixon "had decreased feeling distally and decreased capillary refill." *Id.*, ¶ 13; dkt. 59-5 at 15. Ms. Dixon testified that because she was instructed by Dr. Moore to leave her existing bandage in place, she had to clean her hand with peroxide and peel away the "crusty bandage" herself which was painful. Dkt. 59-4 at 38. She testified that this time, Dr. Moore used steri strips on her. *Id.* Dr. Moore noted that the swelling in her hand had gone down, but Ms. Dixon was not able to flex her finger at the joints. Dkt. 59-1, ¶ 13; dkt. 59-5 at 15. Dr. Moore sent an urgent outpatient request for Ms. Dixon to be seen by an orthopedic specialist even though the x-ray was negative for fracture. *Id.* Dr. Moore prescribed Rocephin, Acetaminophen, Tylenol 3 for pain, and Zofran for nausea. *Id.*

Ms. Dixon saw the orthopedic specialist the next day, and the specialist ordered "exploration of her right pinky wound surgically to rule out partial tendon laceration, as well as digital nerve injury." Dkt. 59-1, ¶ 14; dkt. 59-5 at 16. The specialist noted no acute distress, no signs of infection, that the wound was well approximated, clean and dry, and there was only trace swelling. *Id.* Ms. Dixon testified by affidavit that the outside nurse practitioner, Angela Bradford, told her that the proper procedure for her injury would have been to "clean, examine, evaluate, and close it right away."[3] Dkt. 68-2 at 106.

---

[3] The Court notes that there is no medical documentation to this effect in the record. Nor is there any evidence to support that any other medical professional told Ms. Dixon that her wound should have been closed immediately.

Case 1:19-cv-02670-JMS-TAB   Document 82   Filed 09/15/21   Page 8 of 27 PageID #: 807

The specialist recommended that Ms. Dixon receive Norco for pain, and Dr. Moore ordered 2 tablets of Norco every 12 hours as needed through August 4, 2017. Dkt. 59-1, ¶¶ 15, 18; dkt. 59-5 at 17-18 ("Tylenol #3 makes her very nauseous—Ortho is recommending Norco—325[.]"). Norco is a "non-formulary medication," so Dr. Moore had to submit a "formulary exception request," or "FER." Dkt. 59-1, ¶ 18; dkt. 59-5 at 17-18. She instructed the nursing staff to use the "current supply" in the pharmacy until it was gone while the FER was pending. Dkt. 59-1, ¶ 18; dkt. 59-5 at 20-21. Dr. Moore's review of Ms. Dixon's medical records indicated that she received Tylenol 3 on July 21-23, 2017, and then began doses of Norco once on July 25, twice on July 26-29, and once on July 30, 2017. Dkt. 59-5 at 29.

The specialist performed the surgical exploration of Ms. Dixon's finger on August 1, 2017. Dkt. 59-5 at 39-40. The preoperative diagnosis was: "Right small finger laceration, possible tendon and nerve injury." *Id.* at 39. The surgeon noted that "there was a longitudinal laceration that separated multiple fascicles of the radial digital nerve," but they were "grossly intact." Dkt. 51-1, ¶ 17; dkt. 59-5 at 38-40. "The surrounding dense scar tissue was completely freed off the nerve using tenotomy scissors and scalpel dissection." Dkt. 59-5 at 38. Further findings indicated that [t]he deeper-lying radial digital artery was intact and there was no obvious injury to the flexor tendon sheath." Dkt. 59-1, ¶ 17; dkt. 59-5 at 38-40. The skin was closed with a single layer of Vicryl Rapids suture. Dkt. 59-5 at 38-40.

Dr. Moore ordered Norco as needed every 6 hours through August 13, 2017. Dkt. 59-5 at 19-21. Dr. Moore's review of Ms. Dixon's medical records indicated that she did receive Norco daily—typically two times per day between August 1 and 12, 2017. Dkt. 59-1, ¶ 20; dkt. 59-5 at 28.

8

Dr. Moore then submitted an outpatient request for Ms. Dixon to see the specialist for a post-operative follow-up appointment, scheduled on August 15, 2017. Dkt. 59-1, ¶ 19; dkt. 59-5 at 20. At this appointment, the surgeon documented that the injury site was "well approximated with sutures and healing quite well," and that there was some trace swelling to her finger. Dkt. 59-1, ¶ 21; dkt. 59-5 at 36. Ms. Dixon could flex and extend her finger "minimally due to swelling and stiffness." Dkt. 59-1, ¶ 21; dkt. 59-5 at 36-43.  The specialist recommended that Ms. Dixon perform local wound care, keep her incision clean, dry, and covered until healed, and recommended that she do range of motion exercises. *Id.* Ms. Dixon was referred to their occupational therapy for further education. *Id.* The surgeon did not recommend any medication at this time but indicated a follow-up appointment was necessary to check Ms. Dixon's range of motion in four weeks. *Id.*

Ms. Dixon submitted a healthcare request form on September 24, 2017 stating that she was actively doing her hand exercises but there was no improvement of full range of motion in her finger. Dkt. 59-1, ¶ 22; dkt. 59-5 at 34 (healthcare request form). Ms. Dixon was already scheduled to see a provider at the time of this healthcare request. *Id.* Dr. Moore saw her on October 2, 2017 for a follow-up visit, and Ms. Dixon complained of pain in her finger. Dkt. 59-1, ¶ 23; dkt. 59-5 at 22-24.  Dr. Moore "noted that her right pinky finger presented with a contracture" and immediately referred her to physical therapy for one visit. Dkt. 59-1, ¶ 23; dkt. 59-5 at 22-24.

Ms. Dixon saw the physical therapist two days later, and she was educated on aggressive scar massage, passive stretching, and aggressive range of motion exercises. Dkt. 59-1, ¶ 24; dkt. 59-5 at 25.  She was given a written copy of a home exercise plan to perform 3 times per day. *Id.* No further physical therapy sessions were planned. *Id.* Dr. Moore did not see Ms. Dixon after

October 2, 2017, and Ms. Dixon did not submit any further healthcare request forms related to her finger. Dkt. 59-1, ¶ 25.

### C. Nurse Lowery

Nurse Lowery saw Ms. Dixon when she was brought to the infirmary by an officer on the day of her injury. Dkt. 59-3, ¶ 5 (Lowery Affidavit). Nurse Lowery called Dr. Moore to discuss Ms. Dixon's cut to her finger, and initially told Dr. Moore "it appeared" that the wound "needed stitches." *Id.* Dr. Moore told her she would be in later that day to do the stiches, and Nurse Lowery "cleansed and applied a band aid to the injury to keep it covered," and provided Ms. Dixon with Tylenol from stock. *Id.*; dkt. 59-5 at 3. Nurse Lowery sent Ms. Dixon back to the dorm and instructed that she would be called to the main infirmary when Dr. Moore arrived. Dkt. 59-5 at 3. Ms. Dixon testified that she requested to go back to the infirmary multiple times because she was bleeding through her bandage and was in pain, and when she went back to the infirmary, Nurse Lowery changed the bandage. Dkt. 59-4 at 23-24. Ms. Dixon testified she was put in a larger pressure bandage later that evening on her last visit to the infirmary, and that there was so much gauze that it "took a little bit to bleed through" but it would bleed when she tried to climb on her bed or by "just from naturally having it out[.]" *Id.* at 24. Ms. Dixon testified that no steri-strips were attempted at this time. Dkt. 68-2 at 104.

Nurse Lowery updated the medical record later that evening when Dr. Moore decided not to do stiches. Dkt. 59-5 at 23-24 ("MD decided against stiches at this time due to the status of the laceration."). Dr. Moore gave a verbal order for Ms. Dixon to receive Tylenol 3 every 8 hours as needed for 3 days. *Id.*; dkt. 59-3, ¶ 6. Nurse Lowery put Ms. Dixon on Dr. Moore's schedule for "first thing on Monday July 17, 2017 per the doctor's orders." Dkt. 59-3, ¶ 6. She applied a pressure

dressing, advised Ms. Dixon to ice her hand and keep it elevated, and gave her a Tetanus shot. *Id.*; dkt. 59-5 at 3.

Nurse Lowery received orders from Dr. Moore the next day for Ms. Dixon to receive a "STAT x-ray of her right hand, fingers, and wrist." Dkt. 59-3, ¶ 7. She completed medical instructions for staff in Ms. Dixon's dorm to be instructed that Ms. Dixon was to avoid getting her hand wet in the shower and that "she was to come to the infirmary as needed every eight hours for medication." *Id.*, dkt. 59-5 at 33. The dorm instructions also included that Ms. Dixon was to be provided with ice, 4 times per day to ice her finger for 20 minutes at a time. Dkt. 59-3, ¶ 17; dkt. 59-5 at 33.

Nurse Lowery "did not have the authority to order specific treatment or prescribe medications for Ms. Dixon." Dkt. 59-3, ¶ 8. Her job duties included assessing plans and delivering care to patients, checking and changing dressings as ordered, administering medication per physician's orders, and planning individual treatment programs and implementing treatment plans per physician's orders. *Id.* Nurse Lowery attested that she "had no concerns with Dr. Moore's instructions on July 15, 2017," and followed those orders. *Id.*, ¶ 9.

Nurse Lowery does not recall any times that she received calls from IDOC custody staff for Ms. Dixon to come to the infirmary to take her medications as needed. *Id.*, ¶ 10. Nurse Lowery was not the only nurse working in the infirmary and was not in charge of the infirmary or other nurses. *Id.* She worked day and night shifts and "would only sometimes be working" those shifts in the infirmary. *Id.* Nurse Lowery attested that there are a number of reasons why a patient may not receive as needed medications from the infirmary at the exact time they seek them, such as shift changes or nursing staff being occupied with a medical emergency. *Id.*, ¶ 11. The inmate would be told they could not come at that exact time but that their medicine would be administered

as soon as possible. *Id.* Nurse Lowery attested that "[s]ometimes nursing staff would remember to call that particular offender back to the infirmary but nursing staff also regularly relied on the individual patient to ask to come back for their as needed medication." *Id.*

Nursing staff was also not allowed to administer PRN medication earlier than the time indicated for a subsequent dose. *Id.*, ¶ 12. Nurse Lowery's review of Ms. Dixon's medical records indicated that Ms. Dixon was regularly administered medications, and that Nurse Lowery was not the primary nurse that would administer them. *Id.*, ¶ 13. Nurse Lowery specifically gave Ms. Dixon medication on July 15-16, 19, 21, 24, 28, and August 5, 2017, and [i]t appears that it was mostly other nurses who administered Ms. Dixon her medications during times relevant to her complaint." *Id.*

Nurse Lowery attested that she provided Ms. Dixon with reasonable and appropriate care according to the community standard of care for nursing, and she did not ignore her requests for her PRN medication or refused her medication. *Id.*, ¶ 14.

### D. Nurse Murphy

In her role as the HSA, Nurse Murphy did not treat Ms. Dixon for any medical conditions, including her finger injury. Dkt. 59-2, ¶ 5. Nurse Murphy managed "the institution's overall health care delivery system and monitor[ed] all health service contract activities." *Id.* Her job duties are predominately of "an administrative nature," and she "did not have the authority to order specific treatment or prescribe medications for Ms. Dixon." *Id.*, ¶¶ 5-6. Nurse Murphy did not fill medication orders or administer medicine. *Id.*, ¶ 6. Included in her job responsibilities are duties to evaluate and respond to grievances. *Id.*

Nurse Murphy was not present at the facility when Ms. Dixon cut her finger. *Id.*, ¶ 7. She does not recall when Dr. Moore asked her to have Ms. Dixon moved to a low bunk but attested

that "once the provider would have instructed [her] to move the patient to a bottom bunk, [she] would have put in a request with IDOC custody staff[.]" *Id.*, ¶ 8. She further attested that bed moves "must be coordinated with IDOC custody staff and this can take some time for many reasons not in the control of medical staff." *Id.*

Nurse Murphy recalls discussing with Ms. Dixon her grievances about ensuring that she received her medication timely from nursing staff. *Id.*, ¶ 9. Based on Nurse Murphy's review of Ms. Dixon's medical records, "it appears that Ms. Dixon was regularly administered medication during times relevant to her Complaint," and that the medication was prescribed as "PRN." *Id.*, ¶ 10. Like Nurse Lowery, Nurse Murphy attested that a patient on PRN status "must come to medical" to take medication, and "there may have been occasions when they could not go to medical at the exact moment they requested." *Id.*, ¶ 11. If this happened, an offender "would be told they could not come to the infirmary at that exact moment but that their medication would be administered as soon as possible." *Id.* Offenders were not allowed to receive subsequent doses of PRN medication "a minute early." *Id.* The IDOC Health Care Services Directive 2.17, Medication Management outlines these procedures further.[4]

Nurse Murphy attests that she coordinated a bed move for Ms. Dixon and met with her about her grievances, and as such, was not deliberately indifferent to her medical needs. *Id.*, ¶ 13.

---

[4] "While it is impractical to deliver medications to all offenders in a facility at the exact time at which scheduled, the generally accepted standard is to provide medications within a one (1) hour window, within sixty (60) minutes before or after the designated time. Periodically, circumstances or situations will arise (e.g. lock downs or emergency counts) which derail the nurse's ability to adhere to this standard. In this situation, the nurse shall make all reasonable attempts to administer the medication as close to the prescribed time as humanly possible. (Of course, certain medications do not permit this much leeway in administration; examples include pre-meal insulin and pre-procedure pain medication). *See* dkt. 68-2 at 23.

**E. Transfer and Further Treatment**

Ms. Dixon was later transferred to Rockville Correctional Facility. She testified that treatment for her hand at the new facility has consisted of only exercises, and that she has not been prescribed any medication and only takes Tylenol that she purchases from the commissary. Dkt. 59-4 at 61-63. She testified that no provider told her that she will need any further surgery for her injury. *Id.*

### III. Discussion

At all times relevant to Ms. Dixon's claims, she was a convicted inmate. This means that the Eighth Amendment applies to her deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) she suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir. 2012).

Ms. Dixon does not have a constitutional right to demand specific medications or treatment. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to

the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). Instead, "[a] medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The defendants do not dispute that Ms. Dixon's condition was an objectively serious medical need. Rather, they dispute whether the defendants were deliberately indifferent. Accordingly, the Court will address the second prong of the deliberate indifference analysis as it pertains to each defendant, in turn.

### A. Claims Against Dr. Moore

Ms. Dixon testified that she is suing Dr. Moore for not immediately stitching her wound, for not prescribing proper medication, for not being able to see a specialist or receive physical therapy, and for the delay in receiving a bottom bunk. Dkt. 59-4 at 19-20. She testified she was harmed by Dr. Moore's actions because she experienced loss of blood and pain and can no longer make a fist, pick up items with her right hand, or write with her right hand. *Id.* at 21.

### 1. Dr. Moore's Course of Medical Treatment

Though Ms. Dixon presents general medical text exhibits that discuss post-surgical scar tissue, first aid and emergency care for deep wounds, and severed tendon repair, she has not presented evidence that Dr. Moore's course of treatment for *her i*njury and circumstances was inappropriate. Dkt. 68-2 at 59-65. For example, this literature says that a deep wound "more than ¼ inch deep or is gaping or jagged edged and has fat or muscle protruding *usually* requires stitches." *Id.* at 63 (Mayo Clinic Handbook excerpt) (emphasis added). But this is not evidence

that Ms. Dixon's wound required stitches. Ms. Dixon admitted during her deposition that she did not have evidence that immediate closure of her wound would have changed her current inability to make a fist with her right hand, nor could she answer during her deposition whether Dr. Moore's assessment of her hand was wrong. Dkt. 59-4 at 21, 28.

Though Ms. Dixon attests that the nurse practitioner of the outside specialist's office told her that the wound should have been closed immediately, nothing in the medical record supports such statement. Further, the Court cannot deny summary judgment based on this inadmissible hearsay. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). And, even if this evidence were admissible, disagreement between medical professionals is not enough to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409.

To the extent that Ms. Dixon argues that during the exploratory surgical procedure, that the "radial digital nerve and artery were freed from surrounding scar tissue," in a process known as neurolysis, dkt. 68-2 at 89, and this presence of scar tissue was *caused* by Dr. Moore's delayed closure of her wound, she has presented no competent evidence to support this argument.

Finally, Ms. Dixon's reliance on *Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007), is misplaced. In *Edwards,* a claim against a doctor survived a motion to dismiss where plaintiff was forced to wait for treatment of a dislocated and fractured finger and the medical records were "silent" as to the reason for the delay. *Id.* (addressing claim at pleading stage of litigation). In this case, Dr. Moore articulated her reasoning for pursuing delayed closure of Ms. Dixon's cut; the wound's edges could not be approximated, early stitching would put tension on those edges, her finger was swollen and missing skin, and early closure could have brought on more damaging results of necrosis, gangrene, or even loss of her finger all together. Dkt. 59-1, ¶ 6.

The Court defers to Dr. Moore's decision to delay the closure of Ms. Dixon's cut "unless no minimally competent professional would have so responded under those circumstances" because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). Also, the Court examines the totally of Ms. Dixon's medical care when evaluating whether Dr. Moore was deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted). The record indicates that when Dr. Moore abandoned her initial thoughts of closing the wound immediately, she increased Ms. Dixon's pain medication to Tylenol 3, had a pressure bandage applied, and ordered an x-ray to check for any debris in the wound. She examined the wound within 2 days, used steri-strips later that week to approximate the edges and close the wound, referred Ms. Dixon to an outside specialist when she complained of loss of mobility, and followed recommendations of the specialist to change the course of pain medication. She would later put in a referral for physical therapy.

To the extent that Ms. Dixon complained that Dr. Moore's order to leave her bandage in place from July 15, 2017 to July 20, 2017, caused her pain from having to soak her hand in peroxide to remove the bandage, she has not presented evidence that leaving the bandage in place for four days while the wound closed was inappropriate. To the extent that Ms. Dixon argues that she should have been sent to an outside specialist sooner or to a hospital following the incident, she has provided no evidence that this treatment was necessary, or that Dr. Moore's approach deviated from standard practice.

Ms. Dixon's argument that Dr. Moore did not follow recommendations of the specialist also fails. The medical record indicates that Dr. Moore did prescribe Norco for pain as recommended by the specialist.

Though Ms. Dixon attests that she was ordered to have weekly physical therapy in her post-surgical orders from the specialist, the record does not support her interpretation. *See* dkt. 68-2 at 95 (August 15, 2017 Practitioner Consultation Report) (Prescription suggestions: "[No] Meds. Will need to perform local wound care to incision until fully healed. Weekly OT exercises"). Ms. Dixon was provided with education from occupation therapy after the exploratory surgical procedure conducted by the outside specialist and was instructed to begin performing active range of motion exercises. Dkt. 59-5 at 36. In other words, the specialist anticipated that Ms. Dixon would complete the exercises she was given on her own.

In addition, Dr. Moore did not ignore Ms. Dixon's healthcare request for further treatment when she reported that after doing her hand exercises her finger was not improving on September 24, 2017. *Id.* at 34. At this time, Ms. Dixon was already scheduled to see Dr. Moore, and when she did on October 2, 2017, Dr. Moore noted a contracture and immediately referred her to physical therapy. Dkt. 59-1, ¶ 23. Though, Ms. Dixon argues that she requested physical therapy earlier in September 2017, via email to medical services, this was not a formal grievance or healthcare request, and there was no indication that Dr. Moore was aware of such communication. Dkt. 68-2 at 58 (JPAY letter September 4, 2017). Ms. Dixon's argument that Dr. Moore only referred her for one physical therapy session is also unavailing, as the medical record does not indicate that more sessions were needed after her October 4, 2017 visit with the physical therapist. And, in any event, Dr. Moore did not treat Ms. Dixon after she made the referral for physical therapy. Dkt. 59-1, ¶¶ 23-25. There is no evidence to support that Dr. Moore would have denied any additional therapy

18

sessions, if recommended by the therapist after the initial physical therapy appointment, or subsequently requested by Ms. Dixon.

Ultimately, Ms. Dixon cannot demand this specific level of care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). Nor is she entitled to the best care possible. *Id.* Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson*, 433 F.3d at 1013.

### 2. Dr. Moore's Pain Management Plan

Ms. Dixon's belief that Dr. Moore did not prescribe proper medication or somehow was responsible for delayed administration of medication is unpersuasive. The medical record indicates that Dr. Moore initially prescribed regular Tylenol but after deciding to delay closure of the wound increased this to a prescription level Tylenol 3. Dkt. 59-5 at 3, 5, 9, 15. Based on recommendation of the outside specialist, Dr. Moore subsequently prescribed Norco, instructed the nursing staff to use stock supply until gone, and completed a non-formulary drug form. *Id.* at 17; dkt. 59-1. After Ms. Dixon's follow-up visit with the specialist on August 15, 2017, no further medication was recommended. Ms. Dixon has presented no evidence that the medication she was prescribed was not appropriate for her medical condition.

In terms of Ms. Dixon's complaints regarding the administration of the medication she was prescribed, there is no evidence that Dr. Moore is liable for any shortcomings. Dr. Moore does not fill or distribute medication and relies on nursing staff to follow her orders. Thus, claims based on the theory that Dr. Moore did not ensure that Ms. Dixon received her medication also fail. *See, e.g., Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir.) (internal quotation omitted) ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.").

### 3. Low Bunk

Ms. Dixon testified that it took approximately 9 days to be moved to a low bunk, and that her case manager intervened after she filed a grievance to get this accomplished. Dkt. 68-2 at 105. Dr. Moore attested that she instructed Nurse Murphy to move Ms. Dixon to a low bunk on the day she first examined Ms. Dixon. Dkt. 59-1, ¶ 9. Beyond this, Dr. Moore stated she was not made aware of any problems. *Id.* Nurse Murphy attested that IDOC custody staff would ultimately coordinate the bunk moves. Dkt. 59-2, ¶ 9.

While it is true that the medical record does not refer to any bed move orders, there is no evidence that Dr. Moore or Nurse Murphy ignored any bed move request or were deliberately indifferent to Ms. Dixon's needs. While there may be confusion as to who ordered a bed move and when, Ms. Dixon has not presented any evidence that her delay in receiving a bed move was a medical staff issue—and not an IDOC custody staff issue.

For the reasons explained above, no reasonable fact finder could conclude that Dr. Moore was deliberately indifferent to Ms. Dixon's medical condition. Accordingly, she is entitled to summary judgment.

### B. Claims against Nurses Murphy and Lowery

Ms. Dixon testified that she is suing Nurse Lowery because she prevented Ms. Dixon from coming to the infirmary to get medications and because she did not assist Ms. Dixon by seeking alternatives to Dr. Moore's course of treatment to close her wound immediately. Dkt. 59-4 at 58-60.

Ms. Dixon testified that she is suing Nurse Murphy because she responded to Ms. Dixon's grievances, has control over staff, and should have followed up with nursing staff to timely

administer her medicine. Dkt. 59-4 at 48-49, 53. She also attests that Nurse Murphy stated she would take care of Ms. Dixon's move to a lower bunk.

Finally, Ms. Dixon claims that both Nurses were responsible for delaying her request for physical therapy.

### 1. Alternative Treatment, Low Bunk, and Physical Therapy

As the Court has previously discussed, there is no evidence to support that Dr. Moore's delayed closure of Ms. Dixon's cut was deliberately indifferent. As such, any claim that Nurse Lowery did not explore other alternative treatments for Ms. Dixon on the day of her injury or contact another medical provider to deviate from Dr. Moore's treatment cannot survive summary judgment.

Similarly, as the Court outlined above, there is no evidence to support that Nurse Murphy was deliberately indifferent to a bed move request. Nurse Murphy attested that once Dr. Moore gave her instructions for a bed move, that she would request that IDOC custody orchestrate the move, a move that must be completed by IDOC custody staff. As, IDOC custody staff can take time to accomplish this, it is not in control of medical staff. Dkt. 59-2, ¶ 8. Ms. Dixon presented no evidence that the approximate 9 days that it took to receive a bed move was the result of any medical staff, including Nurse Murphy.

Ms. Dixon's affidavit states that she was delayed follow up on her requests for physical therapy for 7 weeks by the defendant nurses. Dkt. 68-2 at 107. However, as the Court has addressed, Ms. Dixon was not explicitly prescribed in person physical therapy sessions, rather she was educated and provided with home exercises. And after those exercises did not help, she filed a healthcare request form. Dr. Moore responded by referring Ms. Dixon to a physical therapy session. There is no indication that either of these nurses received Ms. Dixon's September 2017

email requesting physical therapy. Thus, there is no evidence to support that these defendants were deliberately indifferent to any need for physical therapy. Dkt. 68-2 at 58 (email sent to "medical services" via JPAY, no response is included in the record).

### 2. Pain Medication

Ms. Dixon argues that both Nurses Lowery and Murphy denied her access to pain medication when she requested it from the infirmary. Ms. Dixon includes full texts of Wexford policies as designated evidence, inclusive of Utilization Management Guidelines, Pharmacy Guidelines, and HCSD 2.17A Policies and Procedures: Medication Management. Dkt. 68-2. To the extent that Ms. Dixon argues that the defendants violated their own policies which caused delay of her receipt of pain medication or that her medication was at times out of stock, this does not establish a constitutional violation. A violation of policy by itself is insufficient to establish a constitution violation. "Section 1983 protects against 'constitutional violations, not violations of . . . departmental regulation and . . . practices[.]'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)).

It is undisputed that Ms. Dixon's medications were prescribed "as needed," that she was responsible for requesting her doses, and that there could be legitimate reasons why medications may not be administered at the exact time an inmate requested them. Ms. Dixon testified that she went to her dorm officer each time she requested a dose from the infirmary and there were "a lot of times" she was not allowed to come to the infirmary because "they were doing MedLine or they were doing shift change," or routine non-emergency activities. Dkt. 59-4 at 51-52.

The details of when and why the defendants would have denied Ms. Dixon pain medication

are unclear.[5] Ms. Dixon submitted her own table chart of the delays of her medication—but this chart does not identify who denied her requests or for what reasons. Dkt. 68-2 at 71. Rather, the Court notes that taken in the light most favorable to Ms. Dixon, her personal chart shows that she received between one and three doses of medication for the majority of the days between the onset of her injury on September 15, 2017 through August 13, 2017, two days before her final follow up with the specialist who then recommend no further medication. Dkt. 68-2 at 72. There are only 5 days, most non-consecutive, notated on her personal chart where she states she did not receive any medication at all: July 25-26; July 31; August 10; and August 13. *Id.* However, some of these dates are contradicted by the medical logs, which show that Ms. Dixon was receiving pain medication regularly. *See* dkt. 68-2 at 74-76; dkt. 59-5 at 27-32. The Court need not scour the record to connect the dots to pinpoint the dates, times, reasons, and specific nurse that Ms. Dixon claims may have denied her any as needed medication.

In addition, Ms. Dixon provided several witness statements to evidence her inability to get medication from the infirmary, but these statements fail to establish that the defendants were personally involved in the denial of medications.[6] Dkt. 68-2 at 67-70. Ms. Dixon's arguments are

---

[5] Ms. Dixon's arguments are convoluted at best. Her affidavit only mentions these defendants by name a few times: (1) On July 16, 2017 "Lowery and/or unknown nurse denied/delayed" her medication multiple times for no reason, (2) another nurse assured here "the delays in medication would be addressed by Murphy," (3) On July 23, 2017 she filed a grievance about 8 hour delay in medication, and "was denied pain medication for the next 48 hours by unknown nurses, including Lowery and Murphy," (4) On July 25, 2017 she was denied medication for 12 hours by Lowery, (5) on July 30, she was denied medication by Lowery and Murphy for 48 hours, and (6) after August 1, 2017, she was never permitted to take her medication as prescribed. Dkt. 68-2 at 106-07.

[6] Witnesses made statements like: "the **infirmary nurses** refused to allow her to come up to the infirmary to take her meds," "I regularly **saw the nurses practice making the women** wait for unreasonable amounts of time for petty reasons," "[t]here was a **culture among the nurse and infirmary staff** . . . and I repeatedly addressed these issues **regarding lack of care coming from the nurses** with the head of the infirmary, Ms. Julie Murphy," and "I recall her expressing repeated

many times general "collective references" to the nurses or staff. Nurse Lowery and Nurse Murphy can only be liable for actions or omissions in which they personally participated, any ongoing injury of which they were unaware does not subject them to liability. *Colbert.*, 851 F.3d at 657.

Even if, at some point, Nurses Lowery or Murphy denied Ms. Dixon any of her as needed medications at the exact time she requested them, this fact would not support a deliberate indifference claim. Deliberate indifference requires "more than negligence and approaches intentional wrongdoing." *Arnett,* 658 F.3d at 751 (internal citation omitted). Medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. *See Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 592 (7th Cir. 1999). "Even objective recklessness— failing to act in the face of an unjustifiably high risk that it is so obvious that it *should* be known— is insufficient to make out a claim." *Petties*, 836 F.3d at 728; *see also Dailey v. Corizon Health*, 2017 WL 6371695, at *2 (S.D. Ind. Dec. 12, 2017) (deprivation of Tylenol 3 of pretrial detainee involved many disputed facts but "these are of no moment because a one-day deprivation of pain medication" did not meet deliberate indifference standard on summary judgment; "a two-day delay is not enough, standing alone, to show a culpable mental state."); *West v. Millen*, 79 F. App'x 190 (7th Cir. 2003) (denial of two doses of pain pills because inmate was not wearing pants at med pass was not deliberately indifferent, "an occasional missed dose of medication, without more, does not violate the Eighth Amendment," plaintiff had not established requisite mental state).

Specific to Nurse Murphy, who undisputedly discussed grievances related to administration of medication with Ms. Dixon, there is no evidence of deliberate indifference. Nurse Murphy attested that she communicated Ms. Dixon's concerns with nursing staff, but that

---

frustration about the difficulties she was having **getting the nurses** to give her medication properly." Dkt. 68-2 at 67-70 (emphasis added).

she is not responsible for filling or administering medication to patients. Dkt. 59-2, ¶ 6, 9. There is no constitutional right to a grievance system, *see Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011), and the denial of a grievance, by itself, is not a federal claim. *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."). There is no indication that Nurse Murphy was aware of any substantial risk of harm to Ms. Dixon and disregarded that risk. Rather, Nurse Murphy conveyed Ms. Dixon's concerns to the nurses on staff to assist in alleviating any issues in the infirmary.

For the reasons outlined above, no reasonable fact finder could conclude that Nurses Lowery and Murphy were deliberately indifferent to Ms. Dixon's medical condition. Accordingly, they are entitled to summary judgment.

### IV. Plaintiff's Motions to Substitute Party for Dr. Moore

Dr. Moore died in December 2020. Dkt. 72. On June 1, 2021 Ms. Dixon filed a motion for substitution of party, dkt. 75, and defendants' counsel provided Ms. Dixon with information regarding Dr. Moore's estate.[7] Dkt. 78 at 2. On July 30, 2021, Ms. Dixon filed a second motion to substitute party stating that Dr. Moore's sole heir, her son, has been identified and is the "proper

---

[7] Defendants' counsel does not represent Dr. Moore's estate or personal representative and does not have authority to bind the estate. Dkt. 78 at 2. Defendants' counsel performed a search for Dr. Moore's estate and located a wrongful death estate that was opened in Dr. Moore's name on May 5, 2021, in Porter County Superior Court under cause number 64D01-2105-ES-004105, and this information was provided to Ms. Dixon on June 7, 2021. *Id.* at 2. Defendants' counsel identified and provided contact information for counsel for Dr. Moore's wrongful death estate, and the personal representative of the wrongful death estate. Dkt. 79 (notice of compliance *ex parte* filing). Defendants' counsel confirmed with the personal representative of the wrongful death estate that "there is no estate open for general estate administration claims," and that the wrongful death estate, "is not subject to general claims." *Id.*

party" for substitution.[8] Dkt. 80.

However, the question of substitution of another party for Dr. Moore is a moot one. The Court has herein ruled on the merits of Ms. Dixon's Eighth Amendment claim against Dr. Moore and found that Dr. Moore is entitled to summary judgment, as no reasonable juror could find that she was deliberately indifferent to Ms. Dixon's medical condition.

The decision to substitute parties lies within the Court's discretion. *See Petrunak v. Krofta*, 2021 WL 2226369, at *3 (7th Cir. June 2, 2021) (citing *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985)). In *Petrunak*, the plaintiff sued his defense attorney for constitutional violations, and the attorney later died. *Id.* The Seventh Circuit considered the substitution issue along with the merits of the case and explicitly dismissed the appeal against the attorney because "there would be no point in putting the parties and others to the trouble of tracking down or even forcing appointment of a personal representative for [the attorney's] estate to file an appellate brief opposing these frivolous claims." *Id.*

It follows here, that the Court will exercise this same discretion and will decline to substitute a successor in interest to defend the claim against Dr. Moore, when that claim has been resolved on the merits in the decedent's favor. Accordingly, Ms. Dixon's motions to substitute at dockets [77] and [80], are **DENIED.**

## V. Conclusion

For these reasons, the defendants' motion for summary judgment, dkt. [57], is **GRANTED**. The plaintiff's motions to substitute, dkt. [77] and dkt. [80], are **DENIED**.

---

[8] Defendants' counsel filed a response on August 9, 2021, stating that circumstances are unchanged since their previous response to Ms. Dixon's motion to substitute party—that counsel has not been retained by the estate, personal representative, or Dr. Moore's son. Dkt. 81 at 3. Defendants requested a status conference on this issue. *Id.*

Final Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 9/15/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

AMANDA N. DIXON
240085
ROCKVILLE - CF
ROCKVILLE CORRECTIONAL FACILITY
Inmate Mail/Parcels
811 West 50 North
Rockville, IN 47872

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Erika Lauren Steuerwald
KATZ  KORIN CUNNINGHAM, P.C.
esteuerwald@kkclegal.com